## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GREGORY JONES,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:22-cv-01313** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **AHSA E. DONLIN, <u>et al.</u>,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Pending before the Court is Defendants' motion to dismiss the complaint and/or motion to enter summary judgment in their favor, filed pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure. (Doc. No. 13.) For the reasons set forth below, the Court will grant Defendants' unopposed motion and enter judgment in their favor.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff Gregory Jones ("Plaintiff"), who is proceeding <u>pro se</u> and <u>in forma pauperis</u>, is an inmate in the custody of the Federal Bureau of Prisons ("BOP"). According to the BOP's inmate locator, he is currently incarcerated at Federal Correctional Institution Otisville in New York,[1] and his projected release date is February 11, 2032.

---

[1]  The BOP's inmate locator is available at the following address: https://www.bop.gov/inmateloc/.

On August 22, 2022, while Plaintiff was incarcerated at Federal Correctional Institution Allenwood in White Deer, Pennsylvania ("FCI Allenwood"), an institution located within the Middle District of Pennsylvania, he commenced the above-captioned action by filing a complaint pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). (Doc. No. 1 at 1, 2.) Named as Defendants are the following individuals, all of whom appear to have worked at FCI Allenwood during the period of time relevant to Plaintiff's <u>Bivens</u> claims: (1) Edward Donlin, an Assistant Health Services Administrator; (2) Michaeleen Powanda, a Mid-Level Practitioner; (3) Thomas Cullen, a Medical Officer; (4) Jamal Jamison, the Warden; and (5) Paul Gibson, the Associate Warden (collectively, "Defendants"). (<u>Id.</u> at 1, 2–3; Doc. No. 13 at 1.)

In his complaint, Plaintiff alleges that Defendants failed to provide him adequate medical care for the "debilitating pain" that he has suffered from "for the past three years[.]" (Doc. No. 1 at 4.) More specifically, he alleges that the events giving rise to his claims occurred on "Mar. 29, 2018, April 1, 2018[,] up to present time[.]" (<u>Id.</u>) Plaintiff claims that, despite his pain, he "still" has "not receive[d] [a] Knee-Replacement." (<u>Id.</u>; <u>id.</u> at 5 (claiming that Defendants Donlin, Powanda, Cullen, Jamison, and Gibson "have dis-regarded recommendation for Knee-Replacement").) In connection with these allegations, Plaintiff seeks the following

forms of relief: "Care level Four facility for Knee-Replacement or Immediate Release[;] and 4 Millions [sic] dollars for pain and suffering." (Id. at 5.)

On September 23, 2022, the Court issued an Order directing the Clerk of Court to serve a copy of the complaint, summons, and waivers on Defendants. (Doc. No. 8.) Following an enlargement of time (Doc. Nos. 11, 12), Defendants filed their motion to dismiss and/or motion for summary judgment pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure on December 28, 2022. (Doc. No. 13.) Defendants subsequently filed their supporting brief and statement of material facts on January 11, 2023. (Doc. Nos. 15, 16.)

In response to Defendants' motion, Plaintiff requested an enlargement of time to file a brief in opposition. (Doc. No. 17.) On March 8, 2023, the Court granted Plaintiff's request and directed him to file his brief in opposition on or before March 29, 2023. (Doc. No. 18.) As reflected by the Court's docket, however, Plaintiff has not filed a brief in opposition, and the time period for doing so has passed. Thus, Plaintiff is "deemed not to oppose" Defendants' motion. See M.D. Pa. L.R. 7.6.

### B.     Factual Background

### 1.     The Court's Local Rules

In accordance with the Court's Local Rules, Defendants filed a statement of material facts in support of their motion for summary judgment.  (Doc. No. 16.)  As reflected by the Court's docket, however, Plaintiff did not file his own statement of material facts, responding to the numbered paragraphs set forth in Defendants' statement.   Thus, under the Court's Local Rules, Defendants' facts are deemed admitted since:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. This Local Rule serves several purposes. First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute. Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designated specific facts showing that there is a genuine issue for trial.' 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted) (emphasis added).

See Williams v. Gavins, No. 1:13-cv-00387, 2015 WL 65080, at *5 (M.D. Pa. Jan. 5, 2015), aff'd sub nom. Williams v. Gavin, 640 F. App'x 152 (3d Cir. 2016) (unpublished) (emphasis in original) (citation omitted).  In fact, Defendants advised Plaintiff in their statement of material facts that, "pursuant to Local Rule 56.1, all facts set forth in [their] statement [would] be deemed admitted unless controverted

by Plaintiff with references to the record supporting Plaintiff's position." (Doc. No. 16 at 1.)

Thus, the material facts in this Memorandum are derived from Defendants' statement of material facts. That being said, the Court has conducted a thorough and impartial review of the record in this matter. To the extent that there are any disputed issues of material fact that are unresolved by Defendants' motion for summary judgment, the Court will expressly note such disputes herein.

### 2.    The Material Facts

On March 29, 2018, Plaintiff arrived at FCI Allenwood and received an initial medical intake screening. (Doc. No. 16 ¶ 3.) On April 1, 2018, Plaintiff complained of pain in his right knee and was evaluated by a registered nurse. (Id. ¶ 4.) The registered nurse advised rest, ice, medication (ibuprofen), and to report to sick call the next morning. (Id. ¶ 5.) On April 5, 2018, Plaintiff reported to sick call and was scheduled to meet with his primary care provider. (Id. ¶ 6.) On April 6, 2018, Plaintiff met with medical staff at the Chronic Care Clinic, and an x-ray for his right knee was ordered. (Id. ¶ 7.) On April 11, 2018, Plaintiff underwent the x-ray, and the radiologist's impression was that Plaintiff had moderate-to-severe medial compartment and mild-to-moderate lateral and patellofemoral compartment osteoarthritic changes. (Id. ¶ 8.)

On April 17, 2018, Plaintiff met with Defendant Powanda during sick call, complaining again of right knee pain. (Id. ¶ 9.) Plaintiff chose to participate in conservative therapy and elected to use a cane and pain medications as treatment. (Id. ¶ 10.) Plaintiff's cane was returned to health services on June 27, 2018, as Plaintiff admitted he was not using the cane as prescribed. (Id. ¶ 11.) Plaintiff's cane was returned to him on July 2, 2018, due to an unrelated medical issue with his left foot. (Id. ¶ 12.)

On October 3, 2018, Plaintiff was evaluated by Defendant Powanda for numerous issues, including right knee pain, and he was scheduled for a steroid injection in his right knee. (Id. ¶ 13.) On October 17, 2018, Plaintiff did not appear for his appointment. (Id. ¶ 14.) On October 25, 2018, Plaintiff reported to sick call, complaining of pain in both knees. (Id. ¶ 15.) An x-ray of his left knee was ordered, and Plaintiff received an injection in his right knee. (Id. ¶ 16.) On October 30, 2018, Plaintiff underwent an x-ray of his left knee, showing minimal tri-compartmental osteoarthritis and bone mineralization (normal for his age). (Id. ¶ 17.)

On January 3, 2019, Plaintiff complained of memory loss. (Id. ¶ 18.) A brain scan consult was written. (Id.) On January 16, 2019, Plaintiff had a colonoscopy, which was normal. (Id. ¶ 19.) On February 26, 2019, Plaintiff underwent a brain MRI, which proved unremarkable. (Id. ¶ 20.)

On July 15, 2019, Plaintiff met with Defendant Powanda for numerous complaints, including pain in both knees. (Id. ¶ 21.) Plaintiff complained that both knees had "given out" on at least two occasions, and he was submitted for a physical therapy consultation. (Id. ¶ 22.) On October 1, 2019, Plaintiff was examined by Dr. Laun Hallstrom, who performed an electro diagnostic evaluation and found no evidence of peripheral polyneuropathy or focal neuropathy. (Id. ¶ 23.) Dr. Hallstrom did find that the "Right Tibial H-Reflex was not obtained. This finding could be seen in associat[ion] with an ipsilateral S1 Radiculopathy." (Id. ¶ 24.) "There are no other findings, however, to support a diagnosis of acute radiculopathy." (Id.) On October 2, 2019, after an evaluation by a physical therapist, an orthopedic consultation was recommended for his knees. (Id. ¶ 25.) Plaintiff was also given a Home Exercise Plan ("HEP") to help address his pain issues. (Id. ¶ 26.)

On October 10, 2019, Plaintiff complained that his right knee gave out and that he had fallen to the ground. (Id. ¶ 27.) X-rays were performed, and no fractures were discovered. (Id. ¶ 28.) The medical staff did note "moderate to severe medial compartment and mild to moderate lateral and patellofemoral compartment osteoarthritic changes[.]" (Id. ¶ 29.)

On November 5, 2019, Plaintiff met with physical therapy again, and an orthopedic consultation was recommended. (Id. ¶ 30.) On November 18, 2019, Defendant Powanda wrote an orthopedic consultation request. (Id. ¶ 31.) On

December 10, 2019, Plaintiff met with Dr. Ball regarding his bilateral knee pain, with a recommendation to refer him to orthopedics for "treatment recommendations and evaluation." (Id. ¶ 32.) On December 17, 2019, Plaintiff met with the orthopedic examiner, who recommended a total knee replacement on his right knee. (Id. ¶ 33.)

On January 6, 2020, Plaintiff met with Defendant Powanda, who noted, "I/M currently does not meet criteria for a total knee replacement, needing further dental, urology evaluations, consults written pending urc. will adjust pain meds per I/M request and ortho recommendation, will add doxazosin to current BPH regimen, f/u at next appointment for a recheck." (Id. ¶ 35.) Defendants Powanda and Cullen signed the note. (Id. ¶ 34.)

On February 3, 2020, Plaintiff met with Defendant Powanda, who noted "he does not have any medical condition that would substantiate the need for a wheelchair, therefore, it is not clinically indicated at this time, will update MDS to reflect this." (Id. ¶ 36.)

On February 7, 2020, Plaintiff underwent a dental clearance examination, required for clearance prior to joint replacement surgery. (Id. ¶ 37.) Plaintiff was also seen by urology during an in-house examination, who recommended a cystoscopy to evaluate lower tract. (Id. ¶ 38.) A surgery called "urolift" was noted as a possibility. (Id.) Plaintiff continued to receive regular medical attention in April

2020, including addressing his bowel issues.  (Id. ¶ 39.)  Due to COVID, the procedures were delayed in May 2020.  (Id. ¶ 40.)

On June 11, 2020, Plaintiff met with Defendant Powanda, complaining of back and knee pain.  (Id. ¶ 41.)  On August 27, 2020, Plaintiff met with Defendant Powanda for an "Advanced Practice Provider Follow Up" encounter at Health Services.  (Id. ¶ 42.)  Defendant Powanda noted that, "Has been seen by ortho, currently undergoing workup for a total knee replacement based upon BOP criteria." (Id. ¶ 43.)  Surgery clearance workup included clearances for a number of issues, including dental, urology, and neurology. (Id. ¶ 44.)

On September 21, 2020, Plaintiff was scheduled for a cystoscopy to satisfy the urology clearance, but this was delayed due to COVID.  (Id. ¶ 45.)  On November 5, 2020, Plaintiff received medical treatment for a fall, alleging that his bad knee gave out.  (Id. ¶ 46.)  A follow-up visit occurred the next day and Plaintiff was given OTC pain medication and did not have observable injuries to the head. (Id. ¶ 47.)

On January 1, 2021, Plaintiff complained of chest pain and was treated by health services.  (Id. ¶ 48.)  Plaintiff tested negative for COVID on January 6, 2021. (Id. ¶ 49.)  Plaintiff was treated again on January 18, 2021 for bowel issues. (Id. ¶ 50.)  Plaintiff tested negative for COVID on January 19, 2021.  (Id. ¶ 51.) On February 3, 2021, Plaintiff was treated for shortness of breath.  (Id. ¶ 52.)

On February 11, 2021, Plaintiff met with Defendant Powanda complaining of bilateral knee pain.  (Id. ¶ 53.)  Plaintiff was given a four-wheeled walker and counseled about its use.  (Id. ¶ 54.)  Plaintiff had a "cystoscopy" pending with urology due to BPH1 with obstruction.  (Id. ¶ 55.)  The March 11, 2021 scheduled target date had to be moved due to COVID.  (Id. ¶ 56.)

On March 8, 2021, Plaintiff met with Defendant Powanda regarding knee pain, and he was given a wheelchair to use to ambulate the compound.  (Id. ¶ 57.) On March 10, 2021, Plaintiff met with Defendant Powanda again, trying to return his wheelchair as "he is being scheduled to be moved to unit 1A to get a job in Unicor." (Id. ¶ 58.)  After consultation with Defendant Powanda, Plaintiff decided to keep the wheelchair.  (Id. ¶ 59.)

On March 18, 2021, Plaintiff had a "Chronic Care Clinic encounter" with Dr. Cullen.  (Id. ¶ 60.)  On April 6, 2021, Plaintiff met with Elizabeth Stahl for physical therapy.  (Id. ¶ 61.)  It was noted that "No motion towards [total knee replacement,]" and she recommended follow-up on knee surgery.  (Id. ¶ 62.)

On April 26, 2021, Defendant Powanda reviewed this report and noted that Plaintiff does not meet BOP criteria for surgery due to pending urology consultation. (Id. ¶ 63.)  On May 7, 2021, Dr. Knight performed a cystoscopy, which showed lateral lobe obstruction, grade II."  (Id. ¶ 64.)  Dr. Knight also recommended that Plaintiff undergo the UroLift procedure.  (Id. ¶ 65; id. ¶ 65 n.3 (explaining this

procedure).)  This procedure was delayed until September 2021 due to COVID restrictions and Dr. Knight's availability. (<u>Id.</u> ¶ 66.)

On May 12, 2021, Plaintiff met with Dr. Stahl of Physical Therapy, who noted that "[total knee replacement] is pending other medical appointments and procedures." (<u>Id.</u> ¶ 67.)  Defendant Powanda reviewed this report and noted that he did not meet criteria due to urology as of June 1, 2021.  (<u>Id.</u> ¶ 68.)  On May 20, 2021, Plaintiff met with Defendant Powanda and requested to have knee injections performed.  (<u>Id.</u> ¶ 69.)  On May 24, 2021, Plaintiff underwent a right knee steroid injection.  (<u>Id.</u> ¶ 70.)  On June 1, 2021, Defendant Powanda noted that Plaintiff still did not meet criteria, due to urology.  (<u>Id.</u> ¶ 71.)

On June 3, 2021, Defendant Powanda performed a left knee steroid injection. (<u>Id.</u> ¶ 72.)  On July 6, 2021, Plaintiff met with Defendant Powanda regarding bladder issues.  (<u>Id.</u> ¶ 73.)  On August 11, 2021, Plaintiff met with Defendant Powanda, regarding a burning sensation when he urinated. (<u>Id.</u> ¶ 74.)  On August 24, 2021, Plaintiff met with her again regarding genital warts.  (<u>Id.</u> ¶ 75.)

On August 26, 2021, Plaintiff met with Defendant Powanda after falling out of bed that morning.  (<u>Id.</u> ¶ 76.)  Plaintiff was given OTC medication.  (<u>Id.</u> ¶ 77.)  On August 31, 2021, Plaintiff had an x-ray performed on his right hip, after he fell out of bed that morning. (<u>Id.</u> ¶ 78.)  No arthritic changes or fractures were discovered. (<u>Id.</u>)

On September 10, 2021, Plaintiff met with in-house urology in preparation for his urolift surgery for the next week.  (Id. ¶ 79.)  On September 17, 2021, Plaintiff underwent urological surgery.  (Id. ¶ 80.)  During the procedure, a "grade 2 bladder trabeculation was discovered, along with lateral lobe obstructive prostatic enlargement." (Id.)  Four implants were inserted, and a catheter was inserted.  (Id.)  On September 20, 2021, Plaintiff's catheter was removed without issue.  (Id. ¶ 81.)  On October 1, 2021, Plaintiff met with in-house urology as a follow-up.  (Id. ¶ 82.)

On October 27, 2021, Plaintiff met with Defendant Powanda regarding lower back pain.  (Id. ¶ 83.)  On November 2, 2021, it was noted that "inmate has not show [sic] up for multiple callouts to health services in order to get his x-ray done." (Id. ¶ 84.)  On November 3, 2021, x-rays were performed on Plaintiff's back, noting "degenerative mild grade 1 retrolisthesis L5 relative to S1, again noted, stable. Minimal degenerative grade 1 anterolisthesis L4 relative to L5."  (Id. ¶ 85.)

On January 19, 2022, Plaintiff met with Defendant Powanda regarding knee pain, and a medication change was made at that time.  (Id. ¶ 86.)  On February 15, 2022, Plaintiff met with Defendant Powanda regarding numerous issues, including knee pain.  (Id. ¶ 87.)  Plaintiff was informed he did not meet BOP criteria for total knee replacement as he had "outstanding urological and dental issues that needed to be addressed which is a required criteria step."  (Id. ¶ 88.)

On March 1, 2022, Plaintiff underwent x-rays of his knees, which revealed his knees to be substantially in the same state as before noting joint space narrowing "has become worse." (Id. ¶ 89.) On March 14, 2022, Plaintiff had a "Chronic Care Clinic" encounter at health services, and it was noted that he "will likely need [total knee replacement]." (Id. ¶ 90.) On March 16, 2022, Plaintiff did not show for his appointment with the optometrist. (Id. ¶ 91.) On March 24, 2022, Plaintiff refused "labs" or "FOB x3." (Id. ¶ 92.)

On April 9, 2022, Plaintiff met with Moir of Health Services regarding bloody bowel movements. (Id. ¶ 93.) On April 11, 2022, Plaintiff met with Defendant Powanda regarding his bloody bowel movements, and he was scheduled for a gastrointestinal evaluation and treatment plan. (Id. ¶ 94.) On April 17, 2022, Plaintiff met with RN Tina Coffi regarding chest pain. (Id. ¶ 95.)

On April 21, 2022, Plaintiff was evaluated by in-house orthopedics, Dr. Lin, and determined that bilateral total knee replacement surgery was necessary. (Id. ¶ 96.) Defendant Powanda reviewed this report on the same day. (Id. ¶ 97.) Prior to knee replacement surgery, he would need clearances for dental, pulmonary, urology, and neurology. (Id. ¶ 98.) Under BOP Policy 6031.04, total knee replacement surgery is considered an elective procedure. (Id. ¶ 99.)

On May 4, 2022, Plaintiff had a televisit with PA Fabian regarding rectal bleeding. (Id. ¶ 100.) On May 6, 2022, Plaintiff consented to a Flexible Cystoscopy,

which was necessary to have urological clearance for his total knee replacement surgery. (Id. ¶ 101.) Plaintiff also needed clearances for CXR and EKG prior to knee surgery. (Id. ¶ 102.) On May 11, 2022, Plaintiff underwent examination to update his CXR and EKG for his bilateral total knee replacement. (Id. ¶ 103.) On May 31, 2022, it was determined that Plaintiff needed clearances for the following: urological (due to May 2022 cystoscopy), neurology (seizure disorder diagnosis), dental, pulmonary (asthma diagnosis) prior to his total knee replacement surgery. (Id. ¶ 104.)

On June 2, 2022, Plaintiff met with Defendant Powanda regarding bleeding from his rectum. (Id. ¶ 105.) He was informed that his total knee replacement surgery was deferred, pending the assessments listed above. (Id.) On June 17, 2022, Plaintiff was cleared by dental for the total knee replacement surgery. (Id. ¶ 106.) On June 24, 2022, Plaintiff underwent an x-ray after falling on his hip, with unremarkable results. (Id. ¶ 107.)

On July 1, 2022, Dr. Knight determined that "no urological is present to not procede [sic] w orthopedic procedure and f/u urology after orthopedic procedure." (Id. ¶ 108.) On July 6, 2022, Plaintiff did not show up for his follow-up appointment with Defendant Powanda. (Id. ¶ 109.) Plaintiff's July 11, 2022 appointment was cancelled due to the provider being on sick leave. (Id. ¶ 110.)

On July 14, 2022, Defendant Powanda reviewed Plaintiff's hip x-rays with him. (Id. ¶ 111.)  It was recommended that a GI evaluation be done, and it was noted that the neurological pre-appointment paperwork was completed.  (Id. ¶ 112.)  On August 10, 2022, Plaintiff met with Defendant Powanda regarding "globs of blood" coming out of his rectum and recommended a GI evaluation.  (Id. ¶ 113.)  On September 1, 2022, Plaintiff met with Dr. Grimes of pulmonology, who cleared him for surgery. (Id. ¶ 114.)  This was reviewed by Defendant Powanda on September 14, 2022.  (Id. ¶ 115.)

On September 14, 2022, Plaintiff met with Dr. Olinksy to determine whether he was fit for a bilateral knee replacement.  (Id. ¶ 116.)  On September 19, 2022, Plaintiff met with Defendant Powanda for an advanced practice provider follow-up encounter where Plaintiff denied any recent falls. (Id. ¶ 117.)  On October 1, 2022, Plaintiff complained of chest pain, GI pain, and nausea.  (Id. ¶ 118.)  Plaintiff was encouraged to rest, avoid solid foods, and to drink fluids.  (Id. ¶ 119.)

On October 14, 2022, EMT Freynik was dispatched to Plaintiff's cell for "seizure activity."  (Id. ¶ 120.) He observed Plaintiff was lying on his right side, with his rhythmic moving of his limbs. (Id.) Plaintiff was responsive to questions.  (Id.) His movements "seemed purposeful" as he was avoiding hitting his head or any objects in his cell.  (Id.) Plaintiff answered questions and demonstrated full

consciousness.  (Id.)  Plaintiff maintained that he could not control his limb movement.  (Id.)

On November 2, 2022, Plaintiff was screened by GI for rectal bleeding.  (Id. ¶ 121.)  GI recommended an evaluation to see if colorectal or hemorrhoidal surgery may be necessary.  (Id. ¶ 122.)  On November 28, 2022, Plaintiff was seen by the in-house general surgeon for an examination, who recommended an evaluation for colorectal surgery for possible hemorrhoidal surgery.  (Id. ¶ 123.)

On December 18, 2022, Plaintiff met with EMT Moir for pain radiating from hip to knee.  (Id. ¶ 124.)  On December 28, 2022, Plaintiff met with Dr. Motto who recommended "internal hemorrhoid banding." (Id. ¶ 125.)  Thereafter, on August 22, 2022, Plaintiff filed his complaint in this action.  (Id. ¶ 126.)

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6) of the Federal Rules of Civil Procedure

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  And a claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion, the court "accept[s] as true all well-pled factual allegations in the complaint and all reasonable inferences that can be drawn from them." See Taksir v. Vanguard Grp., 903 F.3d 95, 96-97 (3d Cir. 2018) (citation and internal quotations omitted). The court also construes the factual allegations "in the light most favorable to the plaintiff[.]" See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010) (citation and internal quotations omitted). The court, however, is not required to credit "conclusions of law" or to draw "unreasonable factual inferences." See Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc., 450 F.3d 130, 133 (3d Cir. 2006).

Additionally, the United States Court of Appeals for the Third Circuit has outlined a three-step process to determine whether a complaint meets the pleading standard established by Twombly and Iqbal. See Connelly v. Lane Const. Corp., 809 F.3d 780, 787 (3d Cir. 2016). First, the court "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.'" See id. (quoting Iqbal, 556 U.S. at 675) (alterations in original). Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" See id. (quoting Iqbal, 556 U.S. at 679). And, third, "'[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine

whether they plausibly give rise to an entitlement to relief.'" See id. (quoting Iqbal, 556 U.S. at 679).

### B. Rule 56 of the Federal Rules of Civil Procedure

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). And, a disputed material fact is "genuine . . . [i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]" See Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991) (citing Anderson, 477 U.S. at 248).

A party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact." See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." See id. at 325.

Once the moving party has met its initial burden, the burden shifts to the nonmoving party, who may not rest upon the unsubstantiated allegations or denials of its pleadings and, instead, must go beyond its pleadings, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to show a genuine dispute of material fact. See Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324.  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is proper.  See id. at 322. Summary judgment is also proper if the nonmoving party provides evidence that is "merely colorable" or that "is not significantly probative[.]"  See Gray, 957 F.2d at 1078.

In addition, when deciding a motion for summary judgment, "the court must view all evidence and draw all inferences in the light most favorable to the non-moving party[.]"  See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008) (citing Davis v. Mountaire Farms, Inc., 453 F.3d 554, 556 (3d Cir. 2006)); M.S. by & through Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 125 (3d Cir. 2020) (stating that, when reviewing a motion for summary judgment, courts are to "view the evidence in the light most favorable to the non-moving party").

## III.   DISCUSSION

In their motion to dismiss and/or motion for summary judgment, Defendants have asserted the following three (3) arguments: (1) Plaintiff has failed to establish that Defendants Cullen and Powanda were deliberately indifferent to his medical needs; (2) Plaintiff has failed to show how Defendants Donlin, Gibson, and Jamison were personally involved in violating his constitutional rights; and (3) Defendants Cullen and Powanda are entitled to qualified immunity.  (Doc. Nos. 13 at 1; 15 at 12–23.)  The Court addresses these arguments in turn below.

### A.   Defendants Cullen and Powanda

As discussed above, Plaintiff asserts an Eighth Amendment claim against Defendants for inadequate medical care pursuant to <u>Bivens</u>.  (Doc. No. 1 at 4–5.) Defendants Cullen and Powanda argue that Plaintiff has failed to demonstrate that they acted with any deliberate indifference to his medical needs, as required to prevail on a claim of inadequate medical care under the Eighth Amendment.  (Doc. No. 15 at 12–18.)  The Court, having reviewed the underlying record in this matter, as well as relevant authorities, agrees with Defendants Cullen and Powanda.

The Court begins its discussion with an overview of <u>Bivens</u>.  "In 1871, Congress passed a statute that was later codified at Rev. Stat. § 1979, 42 U.S.C. § 1983."  <u>Ziglar v. Abbasi</u>, 582 U.S. 120, 130 (2017) ("<u>Abbasi</u>").  This statute "entitles an injured person to money damages if a state official violates his or her

constitutional rights." See id.  Congress, however, "did not create an analogous statute for federal officials." See id.  In other words, Congress did not provide a money damages remedy for persons whose constitutional rights were violated by federal officials.  See id.

One-hundred (100) years later in 1971, the United States Supreme Court ("Supreme Court") decided Bivens.  See id.  In that case, the Supreme Court held that there is an implied cause of action for money damages when a federal official, "acting under color of his authority, conducts an unreasonable search and seizure in violation of the Fourth Amendment." See Shorter v. United States, 12 F.4th 366, 371 (3d Cir. 2021) (citing Bivens, 403 U.S. at 389, 397).  The Supreme Court recognized that "the Fourth Amendment does not in so many words" provide for an award of money damages as a consequence of its violation, but nevertheless explained that, "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." See Bivens, 403 U.S. at 396 (citation and internal quotation marks omitted).

In the decade following Bivens, the Supreme Court implied a cause of action for money damages pursuant to Bivens in two (2) other contexts: one under the Fifth Amendment's Due Process Clause for gender discrimination in the employment context, see Davis v. Passman, 442 U.S. 228, 248–49 (1979); and the other under

the Eighth Amendment's Cruel and Unusual Punishment Clause in the prison medical care context, see Carlson v. Green, 446 U.S. 14, 23–25 (1980). See Bistrian v. Levi, 912 F.3d 79, 89 (3d Cir. 2018); Shorter, 12 F.4th at 371.

In 2017, however, the Supreme Court "made clear" in Abbasi that any further expansion of Bivens "is now a disfavored judicial activity." See Abbasi, 582 U.S. at 135 (citation and internal quotation marks omitted); Hernandez v. Mesa, 140 S. Ct. 735, 741 (2020) (explaining that, after the Supreme Court's decisions in Davis and Carlson, "the Court changed course"); Mack v. Yost, 968 F.3d 311, 318 (3d Cir. 2020) (explaining that "the Supreme Court has consistently refused to expand Bivens actions beyond these three specific contexts"—i.e., Bivens, Davis, and Carlson (footnote omitted)).

Thus, in order to curb any further expansion of Bivens, the Supreme Court has established a rigorous two (2)-part inquiry for courts to follow when determining whether a Bivens action should be extended to a new context. See Bistrian, 912 F.3d at 89–90 (citing Abbasi, 582 U.S. at 139–40); Shorter, 12 F.4th at 372. More specifically, courts must first determine "whether a case presents a new Bivens context" by asking "[i]f the case is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court[.]" See Abbasi, 582 U.S. at 139. "If a case does not present a new Bivens context, the inquiry ends there, and a Bivens remedy is available." Shorter, 12 F.4th at 372 (citation omitted).

Here, Plaintiff's complaint does not present a new <u>Bivens</u> context, as his Eighth Amendment claims of inadequate medical care bear resemblance to <u>Carlson</u>, a case involving an Eighth Amendment "claim against prison officials for failure to treat an inmate's asthma." <u>See</u> <u>Abbasi</u>, 582 U.S. at 140 (citations omitted). Thus, the Court finds that a <u>Bivens</u> remedy is available for Plaintiff's Eighth Amendment claims of inadequate medical care.[2] That being said, the Court turns to the legal tenets of the Eighth Amendment.

"The Eighth Amendment . . . prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294, 296– 97 (1991). However, the United States Constitution "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities, are sufficiently grave to form the basis of an Eighth Amendment violation." <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted). Thus, in order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test[.]" <u>See</u> <u>Porter v. Pennsylvania Dep't of Corr.</u>, 974 F.3d 431, 441 (3d Cir. 2020) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)).

Under the first prong, courts consider whether the deprivation was "'objectively, sufficiently serious[,]" that is, whether "a prison official's act or

---

[2]  Defendants have not argued otherwise.

omission [resulted] in the denial of the minimal civilized measure of life's necessities[.]'" See id. (quoting Farmer, 511 U.S. at 834).  And, under the second prong, courts must consider whether the prison official was "'deliberate[ly] indifferen[t] to inmate health or safety.'" See id. (quoting Farmer, 511 U.S. at 834).

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety.  See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citing DeShaney v. Winnebago Co. Dep't of Social Svcs., 489 U.S. 189, 199-200 (1989))); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 256 (3d Cir. 2010) (explaining that the Eighth Amendment imposes a duty upon prison officials "to ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to ensure that prison officials] take reasonable measures to guarantee the safety of the inmates" (citations and internal quotation marks omitted)).

Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See Farmer, 511 U.S. at 837.  "The knowledge element of

24

deliberate indifference is subjective, . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837-38)).

In accordance with these standards, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated[,]" see Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999), and prison officials violate the Eighth Amendment "when they are deliberately indifferent to an inmate's serious medical need."  See Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020) (citing Estelle, 429 U.S. at 106); Rouse, 182 F.3d at 197 (explaining that plaintiffs must demonstrate the following two (2) elements: (1) "that the defendants were deliberately indifferent to their medical needs[;]" and (2) "that those needs were serious").

"[T]he concept of a serious medical need, as developed in Estelle, has two components, one relating to the consequences of a failure to treat and one relating to the obviousness of those consequences."  See Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991).  The "condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death[,]" and "the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the

necessity for a doctor's attention."  See id. (citation and internal quotation marks omitted).

The concept of "deliberate indifference" requires that the prison official actually knew of and disregarded "an excessive risk to inmate health or safety[.]" See Farmer v. Brennan, 511 U.S. 825, 837 (1994). The Third Circuit has found deliberate indifference when a "prison official: (1) knows of a prisoner's need for medical treatment and intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." See Rouse, 182 F.3d at 197 (citation omitted).

Here, Defendants Cullen and Powanda not only argue that Plaintiff has failed to show that they were deliberately indifferent to his medical needs, but that the record evidence demonstrates otherwise.  (Doc. No. 15 at 13.)   In support, Defendants assert that, since Plaintiff's arrival to FCI Allenwood in March of 2018, he met with health services on approximately one-hundred (100) occasions, during which he received treatment for a variety of issues, including, inter alia, memory loss, chest pain, gastrointestinal issues, urological problems, dental issues, and knee pain.  (Id. at 13–14.)  Defendants further assert that, on each occasion, Plaintiff received medical attention and treatment.  (Id. at 14.)  The Court, having reviewed

the undisputed material facts and the summary judgment record in this matter, is persuaded by Defendants Cullen and Powanda's argument.

The record evidence reflects that, in April of 2018, when Plaintiff first complained of right knee pain, he was evaluated by medical staff at FCI Allenwood, and he underwent an x-ray, which revealed that he had moderate-to-severe medical compartment and mild-to-moderate lateral and patellofemoral compartment osteoarthritic changes. (Doc. No. 16 ¶¶ 4–8.) After consultation with Defendant Powanda, Plaintiff chose to participate in conservative therapy, use a cane, and take pain medications. (Id. ¶¶ 9–10.) Although Plaintiff's cane was returned to health services in June of 2018, as he admittedly was not using the cane as prescribed, the cane was returned to him the following month, albeit for an issue with his left foot. (Id. ¶¶ 11–12.) In October of 2018, Plaintiff complained of pain in both knees, and, as a result, he received a steroid injection in his right knee, and underwent an x-ray of his left knee. (Id. at ¶¶ 13–17.)

The record evidence further reveals that Plaintiff did not start having issues with his knees again until July of 2019, at which point he was referred to physical therapy for a consultation. (Id. ¶¶ 21–22.) In October of 2019, Plaintiff met with a physical therapist who recommended an orthopedic consultation for Plaintiff's knees. (Id. ¶ 25.) Plaintiff was also given a HEP to help address his pain. (Id. ¶ 26.) Around that same time, Plaintiff underwent another x-ray; no factures were

discovered, but staff noted osteoarthritic changes.  (Id. ¶¶ 28–29.)  In November of 2019, Plaintiff met with physical therapy again, and an orthopedic consultation was recommended; Defendant Powanda wrote the request for the consultation.  (Id. ¶¶ 30–31.)  The consultation occurred in December of 2019, and the orthopedic examiner recommended a total knee replacement of Plaintiff's right knee.  (Id. ¶¶ 32–33.)

However, in order to undergo this recommended surgery, Plaintiff was required to be cleared by dental, urology, and neurology beforehand.  (Id. ¶¶ 34, 35, 44.)  Plaintiff was cleared by dental in February of 2020, but an in-house urological examination revealed that a cystoscopy was necessary to determine whether Plaintiff would need to undergo Urolift surgery.  (Id. ¶¶ 37–38.)  Based upon issues related to the COVID-19 pandemic and the specialist's availability, Plaintiff was unable to meet with the urology specialist in May of 2020, September of 2020, March of 2021, and May of 2021. (Id. ¶¶ 40, 45, 56, 66.) Nevertheless, during this period of time, Defendant Powanda treated Plaintiff and provided him with a four-wheeled walker (id. ¶¶ 53–54), as well as a wheelchair to ambulate the compound[3] (id. ¶ 57). Additionally, during this period of time, Plaintiff met with physical therapy (id. ¶ 61), and Plaintiff received steroid injections in his left and right knee (id. ¶¶ 70, 72).

---

[3] Despite Plaintiff's complaints of knee pain, he attempted to return the wheelchair in March of 2021 "to get a job in Unicor." (Doc. No. 16 ¶ 58.)  After consultation with Defendant Powanda, Plaintiff decided to keep the wheelchair.  (Id. ¶ 59.)

In September of 2021, Plaintiff underwent the Urolift surgery.  (Id. ¶¶ 79, 80.) Although it was ultimately determined that this surgery was a success, Plaintiff had to undergo a number of follow-up appointments in order to reach that determination. (Id. ¶¶ 80–82, 108.)    Then, in January and February of 2022, Plaintiff met with Defendant Powanda regarding his knee pain.  (Id. ¶¶ 86–87.)  Plaintiff's medication was changed at the time (id. ¶ 86), and it was noted that he still had "outstanding urological and dental issues" that had to be addressed prior to his total knee replacement surgery (id. ¶ 88).

In April of 2022, Plaintiff was evaluated by in-house orthopedics, and it was determined that a bilateral total knee replacement surgery was necessary.  (Id. ¶ 96.) However, as of May of 2022, Plaintiff still needed clearances for dental, urology (due to May 2022 cystoscopy), neurology (seizure disorder), and pulmonary (asthma).  (Id. ¶¶ 97–98, 104.)  Since then, he has received clearances from dental on June 17, 2022, urology on July 1, 2022, and pulmonary on September 1, 2022. (Id. ¶¶ 106, 108, 114.)

Thus, based upon the foregoing, the Court concludes that Plaintiff had a "serious medical need" as he had been recommended by a medical professional to undergo a bilateral total knee replacement surgery.  Even though Plaintiff had such a need, however, the Court concludes that there is no record evidence to create a genuine dispute of material fact that Defendants Cullen and Powanda acted with

deliberate indifference to that need.  And, specifically, there is no evidence that Defendants Cullen and Powanda actually knew of and disregarded an excessive risk to Plaintiff's health or safety.

Indeed, while the Third Circuit has found deliberate indifference in three (3) instances, none of those instances are applicable here.  See Rouse, 182 F.3d at 197 (finding deliberate indifference when a "prison official: (1) knows of a prisoner's need for medical treatment and intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment" (citation omitted)).  More specifically, there is no evidence to suggest that Defendants Cullen and Powanda intentionally refused to provide Plaintiff with medical treatment, prevented him from receiving recommended medical treatment, or delayed him in receiving such treatment for non-medical reasons.  At most, there is a suggestion in the record that there has been a significant delay in Plaintiff receiving his total knee replacement surgery.

The Court finds, however, that delay, alone, is insufficient to rise to the level of deliberate indifference under the Eighth Amendment.  Instead, the circumstances surrounding the delay must be considered.  In this regard, and as discussed at length above, the record evidence reveals that, in order for Plaintiff to undergo the recommended joint replacement surgery, he must first obtain several medical

clearances—i.e., clearances related to the following issues: dental; urology; neurology; and pulmonary. The record evidence further reveals that these medical clearances required Plaintiff to be scheduled for additional appointments, to undergo various evaluations, and, in some instances, to have surgery or be recommended for future surgery. As a result, these medical clearances took, and are taking, significant periods of time to complete.[4]

In addition, the Court observes that these significant periods of time fell during the height of the COVID-19 pandemic and that, therefore, there were several instances in which Plaintiff's appointments and evaluations had to be postponed due to the pandemic. The Court further observes that, throughout the relevant period of time in which Plaintiff complained of knee pain, he was treated for his pain via physical therapy, steroid injections, medication, a four (4)-wheeled walker, and a wheelchair.

Finally, the Court notes that under BOP Policy 6031.04, a total knee replacement surgery is considered an elective procedure; it is not considered an emergent procedure. This appears to be reflected by the fact that Plaintiff was required to undergo several medical clearances before undergoing this elective procedure. And, in fact, Defendants Cullen and Powanda argue that Plaintiff's

---

[4] Notably, because Plaintiff has not opposed Defendants' motion for summary judgment, the underline current status of Plaintiff's medical need is unclear to the Court.

Urolift surgery constituted a "more pressing medical issue[.]" (Doc. No. 15 at 17.) Plaintiff, however, has not presented any argument or evidence to create a genuine dispute of material fact that these medical clearances or that the associated appointments, evaluations, and surgeries/recommended surgeries were arbitrary or burdensome in any way. The Court finds this lack of argument and evidence to be particularly problematic here for Plaintiff.

Thus, while Court is not unsympathetic to Plaintiff's medical need for a bilateral total knee replacement surgery, the record evidence does not suggest that the delay in Plaintiff receiving this surgery was the result of deliberate indifference on the part of Defendants Cullen or Powanda. See, e.g., Davis v. First Corr. Med., 589 F.Supp.2d 464, 470 (D. Del. 2008) (concluding that, while there may have been a delay in surgery due to diagnostic testing and scheduling, such a delay does not constitute deliberate indifference to the inmate's medical condition without an indication that the delay was due intentional or due to non-medical reasons); Casilla v. New Jersey State Prison, No. 05-cv-04590, 2009 WL 2148012, at *7 (D.N.J. July 16, 2009), aff'd, 381 F. App'x 234 (3d Cir. 2010) (unpublished) (granting medical defendant's motion for summary judgment where plaintiff presented no evidence that the one-year delay in connection with receiving one of his surgeries was due to a non-medical reason, and emphasizing that the plaintiff was under continuous treatment for his knee ailment while awaiting his surgery).

Accordingly, for all of these reasons, the Court concludes that Defendants Cullen and Powanda have met their initial summary judgment burden that there is no genuine dispute of material as to Plaintiff's Eighth Amendment claims of inadequate medical care. Under Rule 56 of the Federal Rules of Civil Procedure, the burden shifted to Plaintiff to respond by pointing to specific facts, supported by evidence in the record, to show a genuine dispute of material fact for trial. Plaintiff, however, has not responded to Defendants' motion for summary judgment, much less pointed to any evidence in the record. See, e.g., Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed.R.Civ.P. 56(c). Thus, the Court will grant Defendants Cullen and Powanda's motion for summary judgment on Plaintiff's Eighth Amendment Bivens claims and enter judgment in their favor. In light of this ruling, the Court need not address Defendants Cullen and Powanda's alternative argument that they are entitled to qualified immunity.

### B.   Defendants Donlin, Gibson, and Jamison

Next, Defendants Donlin, Gibson, and Jamison argue that, even assuming arguendo Plaintiff has pleaded valid constitutional violations pursuant to Bivens, his claims against them fail outright. (Doc. No. 15 at 18.) In support, Defendants assert that Plaintiff has failed to establish their personal involvement with respect to such alleged violations. (Id. at 18–20.) The Court agrees.

"In the limited settings where <u>Bivens</u> does apply," it acts as "the 'federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983'" ("Section 1983"). <u>See</u> <u>Ashcroft</u>, 556 U.S. at 675-76 (quoting <u>Hartman v. Moore</u>, 547 U.S. 250, 254 n.2 (2006)). And, in order for a plaintiff to allege a deprivation of a constitutional right under either <u>Bivens</u> or Section 1983, he must allege the personal involvement of each defendant. <u>See</u> <u>id.</u> at 676 (explaining that, "[b]ecause vicarious liability is inapplicable to <u>Bivens</u> and [Section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988) (stating that a "defendant in a civil rights action must have personal involvement in the alleged wrongs . . ."). The requisite personal involvement can be shown through allegations of personal participation, direction, or of actual knowledge and acquiescence. <u>See</u> <u>id.</u>

Here, Plaintiff alleges in his complaint that Defendants Donlin, Gibson, and Jamison "dis-regarded [sic] recommendation for Knee-Replacement." (Doc. No. 1 at 5.) However, beyond this broad allegation, Plaintiff has not pointed to specific facts, supported by evidence in the record, that these Defendants participated in, directed, or had actual knowledge of and acquiesced in the asserted Eight Amendment violations. Accordingly, the Court concludes that Defendants Donlin,

Gibson, and Jamison have met their initial summary judgment burden as to Plaintiff's Eighth Amendment <u>Bivens</u> claims of inadequate medical care.

Under Rule 56 of the Federal Rules of Civil Procedure, the burden shifted to Plaintiff to respond by pointing to specific facts, supported by evidence in the record, to show a genuine dispute of material fact for trial. As discussed above, however, Plaintiff has not responded to Defendants' motion, much less pointed to any evidence in the record. <u>See, e.g.</u>, <u>Martin</u>, 499 F.3d at 295; <u>see also</u> Fed. R. Civ. P. 56(c). Thus, the Court will grant Defendants Donlin, Gibson, and Jamison's motion for summary judgment on Plaintiff's Eighth Amendment <u>Bivens</u> claims and enter judgment in their favor.

## IV.   CONCLUSION

Accordingly, for the reasons set forth above, the Court will grant Defendants' unopposed motion to dismiss and/or motion for summary judgment (Doc. No. 13) and enter judgment in their favor. An appropriate Order follows.

Dated: September 5, 2023                    <u>s/ Sylvia H. Rambo</u>
                                            SYLVIA H. RAMBO
                                            United States District Judge